# EXHIBIT A

## *DEFENDANT'S NOTICE OF FILING OF NOTICE OF REMOVAL OF ACTION FROM STATE COURT*

*CS(*

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF HENNEPIN                         FOURTH JUDICIAL DISTRICT

---

|  |  |
|---|---|
| Marc Dallon, | Case No.:_____<br>Case Type: Employment |
| Plaintiff, |  |
| v. | **SUMMONS**<br>**(JURY TRIAL DEMANDED)** |
| Nuveen Services, LLC |  |
| Defendant. |  |

---

THIS SUMMONS IS DIRECTED TO THE ABOVE NAMED DEFENDANT:

     1.    **YOU ARE BEING SUED**. The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights. You must respond to this lawsuit even though it may not yet be filed with the Court and there may be no court file number on this summons.

     2.    **YOU MUST REPLY WITHIN 20 DAYS TO PROTECT YOUR RIGHTS**. You must give or mail to the person who signed this summons **a written response** called an Answer within 20 days of the date on which you received this Summons. You must send a copy of your Answer to the person who signed this summons located at:

     SCHAEFER HALLEEN, LLC
     412 South Fourth Street, Suite 1050
     Minneapolis, Minnesota 55415

     3.    **YOU MUST RESPOND TO EACH CLAIM**. The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

     4.    **YOU WILL LOSE YOUR CASE IF YOU DO NOT SEND A WRITTEN RESPONSE TO THE COMPLAINT TO THE PERSON WHO SIGNED THIS SUMMONS.** If you do not Answer within 20 days, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the complaint. If you do not want to contest the claims stated in the complaint, you do not need to respond. A default judgment can then be entered against you for the relief requested in the

complaint.

**5.** **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you do not have a lawyer, the Court Administrator may have information about places where you can get legal assistance. **Even if you cannot get legal help, you must still provide a written Answer to protect your rights or you may lose the case**.

**6.** **ALTERNATIVE DISPUTE RESOLUTION.** The parties may agree to or be ordered to participate in an alternative dispute resolution process under Rule 114 of the Minnesota General Rules of Practice. You must still send your written response to the Complaint even if you expect to use alternative means of resolving this dispute.

Dated: January 11, 2023                    **SCHAEFER HALLEEN, LLC**

By: */s/ Mack H. Reed*
Lawrence P. Schaefer (#195583)
Mack H. Reed (#398703)
412 South Fourth Street, Suite 1050
Minneapolis, MN 55415
Tel. (612) 294-2600
Fax. (612) 294-2640
lschaefer@schaeferhalleen.com
mreed@schaeferhalleen.com

*Counsel for Plaintiff*

| | |
|---|---|
| STATE OF MINNESOTA | DISTRICT COURT |
| COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT |

| | |
|---|---|
| Marc Dallon, | Case Type: Employment |
|        Plaintiff, | Court File No._____ |
| vs. | |
| Nuveen Services, LLC, | **COMPLAINT** |
|        Defendant. | **Jury Trial Demanded** |

Plaintiff Marc Dallon ("Dallon" or "Plaintiff"), by and through his undersigned counsel, and for his Complaint against Defendant Nuveen Services, LLC ("Nuveen" or "Defendant"), states and alleges as follows:

## INTRODUCTION

1. Dallon, a former Nuveen employee, brings this action to vindicate his rights under the Minnesota Whistleblower Act, Minn. Stat. § 181.931, *et seq.* (the "MWA").

2. Dallon was an exemplary employee during the entirety of his employment with Nuveen—a period of almost eight years.

3. In the spring of 2022, Nuveen attempted to coerce Dallon into signing an unenforceable contract. Dallon reported this illegal conduct to Nuveen, and moreover, reported to Nuveen that given the contract's intent to accomplish the furtherance or effectuation of an unlawful purpose, Nuveen's attempts to enforce that contract in the future would be unlawful.

4. Nuveen terminated Dallon's employment less than eight weeks later, in violation of the MWA.

## PARTIES

5. Dallon is an individual who resides in Edina, Hennepin County, Minnesota.

6. Nuveen is a limited liability company organized under the laws of the State of Delaware, with a principal place of business in New York City, New York County, New York State.

7. At all times relevant hereto, Dallon and Nuveen were an "employee" and "employer," respectively, within the meaning of the MWA, Minn. Stat. § 181.931, subds. 2 and 3.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this lawsuit under Minn. Stat. § 484.01, subd. 1(1).

9. Venue is proper in this Court under Minn. Stat. § 542.09 because the facts and occurrences giving rise to this Complaint, or some part thereof, occurred within Hennepin County. At all times during his employment with Nuveen, Dallon performed services for the Company in its Minneapolis, Minnesota office (or, after the onset of the COVID-19 pandemic in March 2020, from his home in Edina, Minnesota).

## JURY TRIAL DEMANDED

10. Dallon demands a trial by jury on all counts so triable.

## FACTUAL BACKGROUND

### A. Dallon Accepts Nuveen's Offer of Employment, and the Company Quickly and Repeatedly Promotes Him

11.     In approximately November 2014, Nuveen extended an offer of employment to Dallon for the position of Vice President, Senior Research Analyst in the Company's Minneapolis, Minnesota office (the "Offer Agreement"). (Exhibit 1.)

12.     Under the terms of the Offer Agreement, Dallon agreed that for 12 months following the termination of his employment with Nuveen he would not: (a) solicit the business of any Nuveen client who had been a client of the Company at any time during the two years before Dallon's termination; or (b) solicit any Nuveen employee who had been employed by the Company at any time during the two years before Dallon's termination to leave Nuveen. (*Id.* at 3) (the "OA Restrictive Covenants").

13.     Consistent with the Offer Agreement, Dallon began his employment with Nuveen as a Vice President, Senior Research Analyst in January 2015.

14.     Dallon performed well in this position, and soon after joining Nuveen in January 2015 the Company promoted him to Senior Vice President and tasked him with the additional responsibility of working closely with senior executives in Nuveen's Minneapolis office to construct a more rigorous fixed-income credit research process.

15.     In 2019, after receiving an "exceeds expectations" performance review, Nuveen promoted Dallon to the position of Managing Director.

**B. Dallon Begins Participating in the Company's Long Term Performance Plan**

16.     In January 2019, Teachers Insurance and Annuity Association ("TIAA")—Nuveen's parent company—implemented a Long Term Performance Plan ("LTPP" or the "Plan") providing opportunities for deferred compensation to the Company's senior executives, management, and other key employees. (Exhibit 2.)

17.     Dallon was a participant in the Plan.

18.     Under the terms of the Plan, Plaintiff received three separate awards that corresponded to three-year "performance cycles" used to measure the value of those awards. (*Id.*, Arts. 2.15, 5.1.) These awards would vest on the last day of February following the completion of each performance cycle—*i.e.*, February 28, 2023, February 29, 2024, and February 28, 2025. (*Id.*, Art. 5.2.)

19.     As a Plan participant, Dallon agreed that for a period of two years after the termination of his employment with Nuveen he would not solicit any of the Company's customers or employees from withdrawing their business or services from Nuveen. (*Id.*, Art. 5.6(b)) (the "Plan Restrictive Covenant").

20.     As of February 2022, Dallon's unvested awards under the Plan were valued at approximately $260,000.

**C. Nuveen Presents Dallon with an Unenforceable Confidentiality Agreement**

21.     On April 26, 2022, Nuveen's human resources department presented Dallon with a Confidentiality and Non-Solicitation Agreement (the "Confidentiality Agreement") (Exhibit 3) and requested that he review, sign, and return the Confidentiality Agreement to the Company by May 13, 2022.

4

22.   The Confidentiality Agreement contained post-employment restrictive covenants that would have prohibited Dallon from: (a) for a period of six months after the termination of his employment with the Company, soliciting any Nuveen employee to end his or her employment with the Company (*id.*, § 2(c)); (b) for a period of 12 months after the termination of his employment with the Company, soliciting Nuveen clients with whom Dallon had material contacts in the last 18 months of his employment to end or reduce their business with Nuveen (*id.*, § 2(d)); and (c) for a period of six months after the termination of his employment with the Company, solicit any other party in a business relationship with Nuveen to end or reduce that relationship (*id.*, § 2(e)) (the "CA Restrictive Covenants").

23.   The Confidentiality Agreement also contained a "special remedies" section addressing the remedies available to Nuveen in the event Dallon breached the CA Restrictive Covenants. In addition to actual damages and any injunctive relief the Company might obtain, Nuveen would also purportedly be entitled to recover significant liquidated damages from Dallon in the event he breached the CA Restrictive Covenants (the "Liquidated Damages Provision"). (*Id.*, § 2(g)(i)-(iii).)

24.   The Confidentiality Agreement expressly would not supersede Dallon's obligations under the Offer Agreement or the Plan. (*Id.*, § 9(b).)

25.   Notwithstanding the fact that the OA Restrictive Covenants, the Plan Restrictive Covenant, and the CA Restrictive Covenants had terms from between six months and two years, the Confidentiality Agreement contained a provision purporting to require Dallon to inform prospective or future employers of his obligations under that

5

agreement for *three* years after the termination of his employment with Nuveen (or with respect to the next three places of Dallon's employment, whichever occurred sooner) (the "Notification Provision"). (*Id.*, § 6.)

26.     The Notification Provision also, during the notification period described in the preceding paragraph, purportedly: (a) required Dallon to provide prospective or future employers with a copy of the Confidentiality Agreement; and (b) authorized Nuveen to notify Dallon's prospective or future employers of the existence of the Confidentiality Agreement. (*Id.*)

27.     Moreover, the Notification Provision contained a prospective waiver whereby Dallon would agree not to assert any claims or causes of action against Nuveen based on its communications to Dallon's prospective or future employers. (*Id.*)

28.     The Confidentiality Agreement provided that its terms would be construed under and governed by the laws of the State of New York. (*Id.*, § 10.)

### D.  Dallon Engages in Protected Activity and Nuveen Terminates His Employment

29.     Dallon regarded the Confidentiality Agreement as unenforceable and did not sign that agreement when it was presented to him on April 26, 2022.

30.     On May 11, 2022, James Kim ("Kim")—Nuveen's Head of Leveraged Finance Research and Dallon's immediate supervisor—sent Dallon an email noting that the Confidentiality Agreement was available on the Company's internal human resources portal and was awaiting Dallon's review and signature. Kim sent Dallon a follow-up email on May 12, 2022 again reminding him to review and sign the Confidentiality Agreement.

31. On May 13, 2022, Dallon responded to Kim's May 12, 2022 email and informed him that he would not sign the Confidentiality Agreement. Kim then forwarded Dallon's email to Frank Howell ("Howell"), Nuveen's Head of Human Resources for Global Fixed Income, who requested a phone call with Dallon.

32. On May 17, 2022 (*i.e.*, the next business day), Dallon and Howell spoke by phone. During that call, Howell informed Dallon that signing the Confidentiality Agreement was a condition of his employment. Dallon then reported to Howell that neither the Liquidated Damages Provision nor the Notification Provision were enforceable. Dallon also informed Howell that he would not sign the Confidentiality Agreement as Nuveen's attempts to coerce him into doing so by threatening his employment were illegal. Howell responded by informing Dallon that if he did not sign the Confidentiality Agreement not only would Nuveen terminate his employment, Dallon would also forfeit his deferred compensation under the Plan.

33. Dallon did not sign the Confidentiality Agreement after his May 17, 2022 call with Howell.

34. On June 9, 2022, Howell informed Dallon in a phone call that Nuveen would terminate Dallon's employment on July 1, 2022 unless he signed the Confidentiality Agreement.

35. On June 10, 2022, Howell sent an email to Dallon memorializing their discussion from the previous day referenced in the preceding paragraph. In that email, Howell reiterated that Dallon would be terminated on July 1, 2022 if he did not sign the Confidentiality Agreement.

7

36.     Dallon did not sign the Confidentiality Agreement, and Nuveen terminated his employment on July 1, 2022.

37.     Howell works in Nuveen's New York office and, on information and belief, was in New York during his interactions with Dallon described herein.

## COUNT I
### RETALIATION IN VIOLATION OF THE MWA
### MINN. STAT. § 181.931, *ET SEQ.*

38.     Plaintiff refers to and incorporates the allegations of Paragraphs 1-37 as if fully re-written herein.

39.     The MWA prohibits employers from retaliating against employees for making a good-faith report of a violation or planned violation of state law or common law. Minn. Stat. § 181.932, subd. 1(1).

40.     The MWA defines "report" as "a verbal, written, or electronic communication by an employee about an actual, suspected, or planned violation of a statute, regulation, or common law, whether committed by an employer or a third party." Minn. Stat. § 181.931, subd. 6.

41.     The Confidentiality Agreement is unenforceable under New York law in at least three ways. First, the Liquidated Damages Provision constitutes an unenforceable penalty. Second, the scope of the Notification Provision is greater than required for the protection of Defendant's legitimate interests and would impose an undue hardship on Plaintiff, in that its temporal scope exceeds the temporal scope of Plaintiff's post-employment restrictive covenants with Defendant by at least one year. Third, the

8

Notification Provision purports to bar Plaintiff's claims against Defendant even if based on Defendant's intentional, willful, or grossly negligent acts.

42.　As alleged above, Plaintiff reported to Defendant what he reasonably and in good faith believed to be an actual violation of state law.

43.　More specifically, Defendant's conduct in presenting Plaintiff with, and requiring Plaintiff to sign on penalty of termination, the Confidentiality Agreement—which Plaintiff believed in good faith violated the law and with respect to which he made a report to Defendant as defined under the MWA—constituted coercion in the third degree under N.Y. Penal Law § 135.60(9).

44.　Furthermore, and as alleged above, Plaintiff reported to Defendant what he reasonably and in good faith believed to be a planned violation of common law.

45.　More specifically, Plaintiff reported to Defendant that because the Confidentiality Agreement intended to accomplish the furtherance or effectuation of an unlawful purpose, Nuveen's attempts to enforce that contract in the future would be unlawful.

46.　As alleged above, Defendant retaliated against Plaintiff by terminating his employment as a result of his reports.

47.　The adverse employment actions as alleged herein constitute violations of the MWA, Minn. Stat. § 181.931, *et seq.*

48.　Defendant's conduct in violation of the MWA as alleged herein was intentional and was performed by Defendant with malice and/or with reckless indifference to the laws that protect Plaintiff.

9

49.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages in the form of past and future wage loss, loss of deferred compensation that otherwise would have been owed to Plaintiff under the Plan, loss of benefits, mental anguish, emotional distress, humiliation, embarrassment, loss of reputation, and attorneys' fees.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant and:

a.   Require Defendant to make Plaintiff whole for Defendant's unlawful actions;

b.   Award Plaintiff the past and future monetary value of any wage losses he experienced as a result of Defendant's illegal conduct in an amount in excess of $50,000, the exact amount to be proven at trial;

c.   Award Plaintiff the deferred compensation that Defendant would have owed to him under the Plan but for Defendant's unlawful actions;

d.   Award Plaintiff monetary damages for his non-economic losses, including emotional distress;

e.   Award Plaintiff his attorneys' fees as provided by statute;

f.   Award Plaintiff pre- and post-judgment interest as provided by statute; and

g.   Award Plaintiff any other relief the Court deems just and equitable.

## COUNT II
### (PLED IN THE ALTERNATIVE TO COUNT I)
### RETALIATION IN VIOLATION OF THE MWA
### MINN. STAT. § 181.931, *ET SEQ.*

50.     Plaintiff refers to and incorporates the allegations of Paragraphs 1-37 as if fully re-written herein.

51.     The MWA prohibits employers from retaliating against employees for refusing an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state law, and the employee informs the employer that the order is being refused for that reason. Minn. Stat. § 181.932, subd. 1(3).

52.     As alleged above, Defendant ordered Plaintiff to sign the Confidentiality Agreement.

53.     Defendant's conduct constituted coercion in the third degree under N.Y. Penal Law § 135.60(9).

54.     As alleged above, Plaintiff refused Defendant's order to sign the Confidentiality Agreement and informed Defendant his reason for doing so was Defendant's attempt to coerce him by threatening his employment.

55.     As alleged above, Defendant retaliated against Plaintiff by terminating his employment as a result of his refusal to obey Defendant's order to sign the Confidentiality Agreement.

56.     The adverse employment actions as alleged herein constitute violations of the MWA, Minn. Stat. § 181.931, *et seq.*

57.     Defendant's conduct in violation of the MWA as alleged herein was intentional and was performed by Defendant with malice and/or with reckless indifference to the laws that protect Plaintiff.

58.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages in the form of past and future wage loss, loss of deferred compensation that otherwise would have been owed to Plaintiff under the Plan, loss of benefits, mental anguish, emotional distress, humiliation, embarrassment, loss of reputation, and attorneys' fees.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant and:

    a.  Require Defendant to make Plaintiff whole for Defendant's unlawful actions;

    b.  Award Plaintiff the past and future monetary value of any wage losses he experienced as a result of Defendant's illegal conduct in an amount in excess of $50,000, the exact amount to be proven at trial;

    c.  Award Plaintiff the deferred compensation that Defendant would have owed to him under the Plan but for Defendant's unlawful actions;

    d.  Award Plaintiff monetary damages for his non-economic losses, including emotional distress;

    e.  Award Plaintiff his attorneys' fees as provided by statute;

    f.  Award Plaintiff pre- and post-judgment interest as provided by statute; and

    g.  Award Plaintiff any other relief the Court deems just and equitable.

## COUNT III
### (PLED IN THE ALTERNATIVE TO COUNT I)
### COMMON-LAW WRONGFUL DISCHARGE

59.     Plaintiff refers to and incorporates the allegations of Paragraphs 1-37 as if fully re-written herein.

60.     As alleged above, Plaintiff refused to participate in an activity that he believed in good faith violated state law.

61.     More specifically, Plaintiff refused to participate in Defendant's attempts to coerce him into signing the Confidentiality Agreement in violation of N.Y. Penal Law § 135.60(9).

62.     As alleged above, Defendant retaliated against Plaintiff by terminating his employment as a result of his refusal to participate in this activity.

63.     Defendant terminated Plaintiff for reasons that contravene a clear mandate of public policy.

64.     Defendant's conduct as alleged herein was intentional and was performed by Defendant with malice and/or with reckless indifference to the laws that protect Plaintiff.

65.     As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages in the form of past and future wage loss, loss of deferred compensation that otherwise would have been owed to Plaintiff under the Plan, loss of benefits, mental anguish, emotional distress, humiliation, embarrassment, and loss of reputation.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant and:

13

a.  Require Defendant to make Plaintiff whole for Defendant's unlawful actions;

b.  Award Plaintiff the past and future monetary value of any wage losses he experienced as a result of Defendant's illegal conduct in an amount in excess of $50,000, the exact amount to be proven at trial;

c.  Award Plaintiff the deferred compensation that Defendant would have owed to him under the Plan but for Defendant's unlawful actions;

d.  Award Plaintiff monetary damages for his non-economic losses, including emotional distress;

e.  Award Plaintiff pre- and post-judgment interest as provided by statute; and

f.  Award Plaintiff any other relief the Court deems just and equitable.

Dated: January 11, 2023                    **SCHAEFER HALLEEN, LLC**

By: */s/ Mack H. Reed*
Lawrence P. Schaefer (#195583)
Mack H. Reed (#398703)
412 South Fourth Street, Suite 1050
Minneapolis, MN 55415
Tel. (612) 294-2600
Fax. (612) 294-2640
lschaefer@schaeferhalleen.com
mreed@schaeferhalleen.com

*Counsel for Plaintiff*

14

## ACKNOWLEDGMENT REQUIRED BY
### MINN. STAT. § 549.211, SUBD. 1

The undersigned hereby acknowledges that pursuant to Minn. Stat. § 549.211, subd.

1, costs, disbursements, and reasonable attorney and witness fees may be awarded to the

opposing party or parties in this litigation if the Court should find that the undersigned

acted in bad faith; asserted a claim or defense that is frivolous and that is costly to the other

party; asserted an unfounded position solely to delay the ordinary course of the proceedings

or to harass; or committed a fraud upon the Court.


*/s/ Mack H. Reed*
Mack H. Reed (#398703)

15

EXHIBIT 1

Nuveen Investments, Inc.
333 West Wacker Drive
Chicago, IL 60606
312.917.7700



NUVEEN
*Investments*

*Mr. Marc Dallon*
*Offer Summary*

We are very pleased to extend this offer of employment to you and look forward to you joining
Nuveen Investments (the "Firm"). The following are the terms of employment:

| | |
|---|---|
| Start Date: | January 12, 2015 (tentative) |
| Title: | Vice President, Senior Research Analyst |
| Reporting Relationship: | Mr. Jon Stevens<br>Managing Director, Director of Research |
| Location: | Minneapolis, MN |
| Initial Base Salary: | Mr. Dallon's initial base salary will be        annually.<br>This base salary will be provided in semi-monthly payments. |
| Annual Variable Pay: | For purposes of this summary, annual variable pay will be in accordance with the Firm's compensation practices and programs which may be in effect from time to time. Mr. Dallon will be eligible to participate in Nuveen Asset Management's 2015 Incentive Compensation Program. This program consists of three components to include quantitative, qualitative and overall Nuveen Asset Management performance, and includes a target and a maximum bonus amount. The 2015 target bonus is      with a maximum bonus opportunity of<br><br>Bonuses will be payable at the time annual variable pay is paid to employees generally (typically the first quarter of the subsequent year). |
| Relocation: | Mr. Dallon will be eligible to receive a taxable lump-sum payment of      payable within 30 days of start date. This payment will be subject to acceptance of the terms of the Nuveen Investments Relocation Repayment Agreement. |
| Other Equity Award Programs: | Mr. Dallon will be eligible to participate in the Nuveen Asset Management equity related programs offered to similarly placed executives in Nuveen Asset Management. |
| Employee Benefits: | Mr. Dallon will be entitled to participate in the benefit programs offered to Firm employees generally, subject to the terms and conditions of those plans, as they may be amended from time to time. |

| | |
|---|---|
| Definition of Cause: | For purposes of this offer summary, Cause shall be defined as follows: (i) engaging in conduct that is injurious to the Firm or its parent; (ii) engaging in any act of dishonesty or misconduct that results in damage to the Firm or its parent or its business or reputation or that adversely affects Mr. Dallon's value to the firm, or his reliability or performance; (iii) refusing or failing to substantially comply with the Firm's human resources rules, policies, directions and/or restrictions relating to harassment and/or discrimination, or with compliance or risk management rules, policies, directions and/or restrictions; (iv) failing to have or losing any license or registration that is necessary for Mr. Dallon to perform any of his duties, or committing any act that could disqualify him from working for the Firm; (v) failing to cooperate in any internal investigation or administrative, regulatory or judicial proceeding; or (vi) substantially failing to perform duties to the Firm, after a written demand for performance has been delivered to Mr. Dallon identifying the manner in which he has failed to substantially perform his duties, and he has failed to cure such failings within a thirty (30) day period; (vii) a material breach by Mr. Dallon of any restrictive covenants or obligations to maintain the confidentiality of non-public Firm information; or (viii) a violation or misrepresentation by Mr. Dallon relating to the terms and acknowledgments of this offer of employment. |
| Acknowledgment of Mr. Dallon regarding Confidential Information and Compliance with Other Agreements: | Mr. Dallon acknowledges that the Firm has not requested and that Mr. Dallon has not provided to the Firm any confidential or proprietary data concerning in any way or relating to his current or any former employer, including, without limitation, business documents, information systems, sales or marketing data, client lists or trade secrets. Mr. Dallon represents, warrants and covenants to the Firm that he has returned, or will return by his commencement of employment with the Firm, any such confidential or proprietary data and will retain no copies of such information. Mr. Dallon further represents, warrants and covenants that he has complied with the terms of any employment agreement or other agreement, including any non-compete agreement, with his prior employer or employers in all material respects and particularly any provisions regarding preservation and non-disclosure of confidential information and competition contained therein and that there is no contractual impediment to him joining the Firm. |
| Confidential Information: | Mr. Dallon acknowledges that he has had and will have access to confidential information (including, but not limited to, current and prospective confidential know-how, pricing, sales and marketing information, inventions, trade secrets, client, investor and prospect lists, actual and proposed investments and business plans) concerning the business, clients, |

investments, plans, finances, and assets of the Firm that is not generally known outside the Firm. Mr. Dallon agrees that he will not at any time directly or indirectly use, divulge, furnish or make accessible to any person any Confidential Information, but instead shall keep all Confidential Information strictly and absolutely confidential.

Covenant Not To Solicit: During his employment and for a period of 12 months from the effective date of termination of employment, Mr. Dallon will not directly either as principal, agent, independent contractor, consultant, director, officer, employee, employer, advisor (whether paid or unpaid), stockholder, partner, member or in any other individual or representative capacity whatsoever or cause others to (a) solicit, divert or take away as a customer or client any customer or client of Firm or its affiliates, or any person or entity which was a customer or client of Firm or its affiliates at any time during the two years preceding the effective date of termination of employment, provided, however, this covenant shall not prevent Mr. Dallon from being employed by another financial institution subsequent to the termination of his employment with the Firm or prevent him from soliciting a client of the Firm or its affiliates subsequent to the termination of his employment with the Firm so long as such solicitation is not adverse to the interests of the Firm or its affiliates, is not intended to reduce the client's use of any product or service of the Firm or its affiliates, and does not diminish or jeopardize the Firm's or its affiliate's relationship with the client in any way; or (b) employ or seek to employ any employee of the Firm, or any person who was an employee at any time during the two years preceding the effective date of termination of employment with the Firm, nor seek to persuade any such employee or former employee to become employed by any direct or indirect competitor of the Firm.

Representations of Mr. Dallon: By executing acceptance of the employment offer Mr. Dallon represents that he is not subject to any order of the Securities and Exchange Commission ("SEC"), has not been convicted within the previous ten years of any felony or misdemeanor, is not subject to any order, judgment or decree of any judicial body, governmental agency or securities self-regulatory organization, that he is not presently being investigated by the SEC or the FINRA, Inc. or any state securities regulatory agency, that no one has filed a claim against him for violation of federal or state securities laws, and that Mr. Dallon will promptly notify the Firm if any of these circumstances should change.

Withholdings:

All payments provided herein shall be subject to required tax and other withholdings.

The Offer:

Mr. Dallon understands and agrees that this document constitutes the terms of an employment offer and is not a contract of employment. This offer shall inure to the benefit of and bind the parties hereto, and their successor(s), assigns or other legal representatives. Mr. Dallon understands that the employment relationship with the Firm is an at-will relationship and may be terminated by the Firm or by Mr. Dallon at any time, with or without cause and with or without notice. This offer is contingent upon Mr. Dallon's successful completion of the Firm's standard application process, including regulatory and general background check, and fingerprinting, if applicable. To accept this offer, please sign below and forward the document in its entirety to: heather.rucci@nuveen.com

Ms. Heather Rucci
SVP, Human Resources

**ACCEPTED:**

Mr. Marc Dallon

11/12/14

Date

# EXHIBIT 2



# TIAA Long Term Performance Plan

January 1, 2019

1753013_2

**TIAA Long Term Performance Plan**

## ARTICLE 1
### Purpose of Plan

The TIAA Long Term Performance Plan (the "Plan") is designed to foster a Company-wide focus among executives and management thereby contributing to a mutually supportive environment focused on the accomplishment of the Company's short term and long range goals and the implementation of related strategic plans. The purpose of the Plan is to provide senior executives, management and other key employees with increased compensation opportunities that are based on the creation of increased value to Company participants and clients through improved long-term financial performance and service. Such opportunities are intended to provide, in combination with other forms of compensation and benefits, a competitive total compensation program that can attract and retain a superior senior executive, management and key employee group, which is integral to the overall success of the Company.

**ARTICLE 2**
**Definitions**

2.1    Award: A LTPP Award or a Fund Interest granted to a Participant under this Plan.

2.2    Beneficiary:  The person or persons determined under Section 7.7 to receive a payment pursuant to Section 6.2.

2.3    Code:  The Internal Revenue Code of 1986, as amended.

2.4    Committee:  The Human Resources Committee of the TIAA Board of Trustees.

2.5    Company: Teachers Insurance and Annuity Association of America ("TIAA") and any other subsidiary of TIAA that elects to grant awards under the Plan with the approval of the Plan Administrator.  The list of Companies under the Plan shall be updated by the Plan Administrator and attached hereto as Appendix B.

2.6    Disability:  A medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than 12 months and by reason of which the Employee is either (within the meaning of Section 409A(a)(2)(C) of the Internal Revenue Code, as amended, to the extent applicable) (a) unable to engage in any substantial gainful activity, or (b) receiving income replacement benefits for a period of not less than 3 months under a Company disability plan. For clarity, this definition of Disability will not apply to any other policy or procedure of the Company outside of this Plan unless explicitly stated in such policy or procedure.

2.7    Employee:  An individual who is employed by the Company (or was employed by such Company in the most-recently completed Plan Year and has remained continuously employed since with Related Company(ies)) and is on the Company  payroll (or was previously on the Company payroll and is now on a Related Company's payroll) as an employee.  Individuals who are not treated as employees on the Company's payroll records, such as leased employees (within the meaning of Section 414(n) of the Code), independent contractors, and individuals who are hired through temporary agencies as independent contractors or under any other arrangements, are not Employees and are not eligible to participate in the Plan; this rule applies even if a court or administrative agency determines that any such individual should have been treated as an employee under applicable law (including common law) or other legal standards.  For the avoidance of doubt, the payroll system of the Company shall include the payroll system of any professional organization (or similar entity) engaged by the Company for regular salary payments to its employees.

2.8    Fund Interest: A notional interest in a Participating Fund (which may be denominated in notional shares or other units, as determined by the Plan Administrator), whose value at specified dates will be used to calculate amounts payable pursuant to this form of Award. Each Fund Interest granted to a PM Team Member will represent a notional interest in only one Participating Fund.  Fund Interests are used for administrative bookkeeping purposes only and are not transferable and have no value outside of this Plan.

2.9   Fund Interest Value:  The value of a Fund Interest as determined based on the most recent valuation of the corresponding Participating Fund to which such Fund Interest relates.

2.10   Good Standing:  An Employee is in Good Standing if current work performance is satisfactory (as determined in the sole discretion of the Company) and he or she is not on written or final warning.

2.11   Leave of Absence:  A period of time during which active employment is suspended for a reason other than Disability, which is approved by the Company and may be paid or unpaid.  A Leave of Absence does not include short-term disability leave or parental, family-related, or similar leaves provided by applicable law, which are each considered for purposes of this Plan to be periods of employment by the Company.

2.12   LTPP Award: An award valued over a Performance Period subject to the terms and conditions of this Plan. LTPP Awards are recorded in the books and records of the Company and with respect to LTPP Awards granted on or after January 1, 2019, are denominated in the currency in which such Participant's regular salary payments are made by the Company. The value of the LTPP Award at specified dates will be used to calculate all or a portion of the amount of awards that are payable under the Plan. They are not transferable and have no value outside this Plan.

2.13   Participant: An Employee who receives an Award under the Plan.

2.14   Participating Fund:  Any current or future investment product managed by TIAA or its affiliates as determined by the Plan Administrator (or his designee) for inclusion in this Plan.

2.15   Performance Cycle:  The three-year period during which performance will be measured for purposes of measuring the value of an Award under this Plan.

2.16   Performance Unit: An LTPP Award that is communicated to eligible Employees as units with a specified value denominated in U.S. dollars and which value incorporates cumulative Performance Factors. Performance Units are a method of communicating LTPP Awards and do not reflect separate awards from a LTPP Award.  The number of Performance Units that are granted to an eligible Employee shall be determined by dividing the amount to be granted as an LTPP Award by the Performance Unit Value as of December 31 immediately preceding the grant date. Quotients calculated pursuant to the preceding sentence shall be rounded up to two decimal places.  The value of Performance Units will be adjusted annually based on the Performance Factor such that the final payout of a grant of Performance Units will be equal to the Recorded Value of such LTPP Award.  The Company will continue to track the Recorded Value of LTPP Awards communicated as Performance Units.

2.17   Performance Factor:  A percentage determined by the Committee, in its sole discretion, based on the annual performance of the TIAA enterprise, taking into account such applicable performance results from the Plan scorecard as determined by the Committee annually.  A Peformance Factor will be determined for each Plan Year.

2.18    Performance Unit Value: The value of a Performance Unit (rounded to four decimal places) as determined by the Committee, in its sole discretion, based on the annual performance of the TIAA enterprise, taking into account such applicable performance results from the Plan scorecard as determined by the Committee annually.

2.19    Plan: The TIAA Long Term Performance Plan.

2.20    Plan Administrator: The individual identified in Section 3.2 to administer the Plan.

2.21    Plan Year: A calendar year. All other references to "year" shall mean a calendar year unless otherwise specified.

2.22    PM Team Member: An Employee who is (a) a member of a team or teams that manages one or more Participating Funds at the time of a grant under Section 5.1 of the Plan and (b) approved by the Plan Administrator (or his designee) to be eligible to receive Fund Interests.

2.23    Progressive Rate Table: A table of total compensation levels, maintained by the Plan Administrator, or his delegates as reflected in Exhibit C, that sets forth the minimum total compensation necessary to participate in the Plan in any given Plan Year.

2.24    Recorded Value: (a) The amount of an LTPP Award. The initial Recorded Value of an LTPP Award is the amount of the awarded amount on the grant date. On an annual basis, the Recorded Value will be adjusted for the Performance Factor for such year in accordance with Section 5.3(a). A Recorded Value for each LTPP Award is maintained on the books and records of the Company in the same currency in which the Participant's regular salary payments aremade by the Company.

(b) Effective as of January 1, 2019, in the event a Participant's employment transfers to a different jurisidiction such that the Participant's regular pay will be paid in a different currency, then solely with respect to LTPP Awards that were not outstanding as of December 31, 2018, the Recorded Value of each LTPP Award held by such Participant will be converted to such new currency as of the date of the transfer, using such exchange rate methodology as the Company determines in its sole discretion.

2.25    Related Company: A majority-owned direct or indirect subsidiary of TIAA.

2.26    Retirement: A Participant's separation from service after either (a) the attainment of age 50 and the completion of ten consecutive years of service immediately preceding separation, or (b) the attainment of age 55 and the completion of five consecutive Years of Service immediately preceding separation.

For clarity, the definition of Retirement does not apply to or alter any other policy or procedure of the Company outside of this Plan regarding eligibility for other benefits unless explicitly stated in such policy or procedure. The definition of Retirement does not constitute and is not intended to constitute a mandatory retirement policy at the Company.

4

2.27   Year of Service:  Each completed period of 12 months since the Participant's date of hire (or, if more recent, date of rehire) with the Company and any Related Company (including any predecessor thereto); including any time with such company prior to becoming related to TIAA.

All references to "he", "his" or "him" in the Plan shall also be deemed to refer to "she" or "her".

## ARTICLE 3
### Administration

3.1   (a)   The Plan Administrator shall determine the Employees who will participate in the Plan in accordance with Section 4.1 and the terms and conditions, not inconsistent with the provisions of the Plan, of any grant hereunder.

       (b)   The Committee reserves the right (i) to amend or terminate the Plan without notice at any time, and for any reason (provided that such amendment or termination may not negatively impact then-existing awards), and (ii) to make equitable adjustments with respect to the terms of the Plan and their applicability to any Participant to prevent any unintended impact arising from extraordinary events outside the normal course of business on or after the January 1, 2005 effective date of the Plan. The TIAA Compensation & Benefits Committee is delegated the authority described in the preceding sentence except with respect to the authority to amend this Section 3.1 or to terminate the Plan.

       (c)   All decisions made by the Committee (or its designee) pursuant to and in interpretation of the provisions of the Plan shall be final and binding on all persons, including the Company, Participants and beneficiaries.

3.2   The Senior Vice President, Head of Total Rewards of TIAA shall administer the Plan in accordance with the terms hereof and shall adopt, and may amend from time to time, such administrative rules, guidelines and practices to govern the Plan as he shall, from time to time, deem advisable, to interpret the terms and provisions of the Plan and any award issued hereunder, and to otherwise administer the Plan (including, but not limited to, amending Appendix A as necessary to conform to existing practice consistent with the Committee's original intentions).

**ARTICLE 4**
**Eligibility and Participation**

4.1 Eligibility:  An Employee will be eligible to participate in the Plan with respect to a particular Performance Cycle if, as of the grant date of Awards for such Performance Cycle, such Employee's total compensation (base salary and variable compensation awards) from the Company for the year preceding the Performance Cycle equals or exceeds the minimum total compensation threshold listed on the Progressive Rate Table. In addition, the Plan Administrator may determine whether, for any Performance Cycle, any other Employees are eligible to participate in the Plan.  The Plan Administrator's determinations are within his sole discretion and all decisions made will be final.  This section shall not be construed as giving any of the above listed Employees or any other employee a right to participate in this Plan.

4.2 New Entrants After the Start of a Performance Cycle:  At the discretion of the Plan Administrator, an Employee who is hired into an eligible position, or is otherwise to be awarded at the discretion of the Company a special long-term performance award outside of the annual incentive compensation cycle, after the commencement of a Performance Cycle and who is in Good Standing shall be eligible to participate in that Performance Cycle as of the date of hire or special award grant.  Participation in such Performance Cycle under this Section 4.2 shall not be construed as giving any Employee the right to participate in this Plan with respect to any other Performance Cycle.

4.3 Change in Eligibility Status:  An Employee, who was once eligible for participation in the Plan, may subsequently become ineligible for additional grants in subsequent Performance Cycles if he or she subsequently does not meet the criteria specified in Section 4.1, and no provision of the Plan shall be construed as giving any Employee who has become a Participant a right to future grants under the Plan for any other Performance Cycle.

4.4 Non-U.S. Participants. Notwithstanding anything herein to the contrary, with respect to Participants working outside the United States, the Plan Administrator may establish additional or alternative rules to be set forth on appendices hereto to adjust or provide for additional terms and conditions as are necessary or advisable to fulfill the purposes of the Plan and to comply with applicable local law or practice, including tax and securities laws of jurisdictions outside the United States.

**ARTICLE 5**
**Grants, Vesting and Payment of Awards**

5.1   Grant of Awards:  At the beginning of each Performance Cycle, if an eligible Employee's performance warrants and provided the Employee is in Good Standing, the Employee will be eligible to receive a long-term performance award for the preceding year, in an amount determined under the Progressive Rate Table or the Plan Administrator that, if granted, will be recorded as a grant of Awards subject to the terms and conditions of this Plan. The Plan Administrator shall determine the terms of any such grant, including, but not limited to, the grant value of the Award and the Performance Cycle to which such grant relates.  Awards for all Participants other than PM Team Members will be granted exclusively as LTPP Awards.  For PM Team Members, Awards may be made as LTPP Awards and Fund Interests associated with certain Participating Funds managed by the PM Team Member's team(s) in such allocations as determined by the Plan Administrator (or his designee).

The Plan Administrator, at his discretion, may require individual grant recipients under this Plan to execute an award agreement as a condition to receiving such grant.  In such event, such agreement may include additional terms and conditions as determined by the Plan Administrator and may provide that any or all of the events in Article 6 will not apply to such grant.  Such grant agreement may be entered into by TIAA on behalf of any Company.

5.2   Vesting:  Except as  otherwise provided in Section 5.5, Section 5.6, Article 6 or by the terms of any award agreement, a Participant will vest 100% in Awards granted for a Performance Cycle as of the last day of February following the completion of the Performance Cycle (or such other date as determined by the Plan Administrator on which such Awards are paid out as set forth in  an applicable award agreement).  No Participant shall have a right to any Award or part of an Award until he is vested  in such Award.

5.3   Valuation of Awards:

(a) LTPP Awards shall be determined annually as of each December 31 by mutiplying the Recorded Value for such LTPP Award by the Performance Factor for such year. (If such LTPP Award is communicated in Performance Units, the Performance Unit Value will be determined by multiplying such value as of the December 31 prior to the Plan Year by the Performance Factor for the Plan Year).

(b) Fund Interest Value will be determined at such times as required under the Plan (e.g., grant date and payment date) as of the most recent valuation date of the Participating Fund to which the Fund Interest relates.

5.4   Calculation of Awards and Payments:  Except as otherwise provided in Section 5.5, Section 5.6 or Article 6 or by the terms of any grant made under Section 3.3, payment of an Award shall be made upon vesting (as set forth in Section 5.2) or as soon as administratively practicable thereafter.

For LTPP Awards, payment will equal the Recorded Value of the LTPP Award as of vesting. (For LTPP Awards communicated as Performance Units, final payment for such LTPP Award will be communicated as determined by multiplying the Performance Unit Value as of December 31 of the final year of the Performance Cycle immediately preceding the payment date by the applicable number of Performance Units, which amount will equal the Recorded Value. All Performance Units paid to Participants outside of the United States will be paid in the local  currency in which their regular pay is paid and the Company may use such exchange rate methodology as it determines in its sole discretion for purposes of converting the payment amount into local currency.)  The amount of each payment of a Fund Interest will be determined by the most recent value of the corresponding Participating Fund to which such Fund Interest relates.

Notwithstanding anything herein to the contrary, no payment of an Award under this Plan may made to the extent that the Plan Administrator, in his sole discretion upon guidance from counsel, reasonably anticipates that such payment would violate applicable law, regulation, or other guidance or directive from a regulatory authority.  In the event that the Plan Administrator, in his sole discretion upon guidance from counsel, later reasonably anticipates that paying such award will not cause such violation, the payment must be made at the earliest date following such determination, consistent with Treas. Reg. 1.409A-2(b)(7)(ii).

5.5   Forfeiture:  Notwithstanding anything in the Plan to the contrary, a Participant who is subject to immediate dismissal due to misconduct or other serious infraction of Company policy or practice at any time (as determined by the Committee or the Plan Administrator), or who would have been subject to such immediate dismissal had the Company been aware of such misconduct or infraction prior to the termination of the Participant's employment, shall immediately forfeit any right to any outstanding Awards and any right to receive Award.  In addition, in the event that the Company suspects that a Participant has engaged in misconduct or a serious infraction of Company policy or practice, the Company may suspend payment of any outstanding Awards that are otherwise payable until such time as the Company determines either that such misconduct or infraction has occurred (in which case the preceding sentence shall apply) or that no such misconduct or infraction has occurred (in which case any outstanding Awards impacted by this Section 5.5 will be paid out as soon as practicable based on the Awards' most recently determined value prior to the date of the Company's final determination that no misconduct or infraction occurred); provided however, that in the event the Plan Administrator reasonably determines that any such Award is deemed to be "nonqualified deferred compensation" subject to Section 409A of the Code, the Company may not suspend payment of any such Award in accordance with this Section 5.5 beyond the end of the calendar year in which the Award is otherwise scheduled to be paid.  This Section 5.5 shall apply regardless of whether the Participant is eligible for Retirement under Section 6.4 or disability or leave under Section 6.3, or has had a job elimination, job relocation or change in job responsibilities within the meaning of Section 6.5.

5.6   Confidentiality, Non-Solicitation, Non-Disparagement and Non-competition Provisions:

(a) All Participants must, during and following their employment with the Company, maintain the confidentiality of TIAA and its affiliates' confidential information and trade secrets, and refrain from using such information, (which was developed and/or compiled by TIAA and its affiliates through its expenditure of significant time, effort, and expense), for their own benefit, or the benefit of a third party. Such information is only to be used in conjunction with Participant's provision of services for TIAA and its affiliates, and includes, but is not limited to: customer or prospective customer, identities, contact information, financial information and preferences; TIAA and its affiliates' information regarding finances, marketing, pricing, vendors, consultant and independent contractor lists; computer hardware or software use, design, content, or access information. Upon legal compulsion to disclose such information, Participant must provide the Company with written notice, along with a copy of the document purporting to require disclosure, prior to making any such disclosure (unless the subpoena, court order or legal process arises from an investigation of a possible legal or regulatory violation or whistleblower activity as described below). Any request for documents or information addressed to the Company itself, or seeking the Company's position or response on any matter, must be referred to the responsible individual within the Company for an official response on its behalf.

(b) During the course of employment, and until the later of (i) the expiration of two years following a Participant's termination of employment for any reason, or (ii) the date on which the Participant vests in all Performance Units that are outstanding on the date of the Participant's termination of employment, a Participant must also refrain from causing, convincing, or encouraging, directly or indirectly, on behalf of themselves or any third party, any customer with whom the Participant enjoyed a personal relationship, or any other Company customer, or any Company employee, vendor, consultant or independent contractor, from withdrawing their business, accounts, relationships and/or services from the Company, and diverting that business, account, relationship and/or service elsewhere.

(c) Following employment, Participants must also refrain from directly, indirectly or anonymously, making or causing to be made any statements or comments (through the internet, industry outlets or channels, social media, television, radio, print media, or before or to any other audience (including to current, former or prospective customers or employees)) that defame or disparage the Company or its affiliates (including its officers, directors, trustees, employees, or agents and any of its products or services) in any way, with respect to any matter through communications that state or imply that the services or business practices of the Company and/or its affiliates are or were inconsistent with industry standards, unlawful or otherwise improper or harass (as defined in TIAA's EEO policy (a copy of which is available upon request)), threaten, or make knowingly false statements against trustees, representatives, officers, directors, or employees of the Company or of its affiliates.

(d) Section 5.6(a)-(c) shall apply regardless of whether the Participant is eligible for Retirement under Section 6.4 or disability or leave under Section 6.3, or has had job elimination, job relocation or change in job responsibilities within the meaning of Section 6.5.

(e) A Participant who voluntarily separates from service with the Company and is eligible for Retirement is also subject to the requirements of this Section 5.6(e).  This Section 5.6(e) requires that, during the term of such Participant's employment with the Company and until the later of (i) the expiration of two years following the Participant's termination of employment for any reason, or (ii) the date on which the Participant vests in all Awards that are outstanding on the date of the Participant's termination of employment, the Participant must not, directly or indirectly, without the advance written consent of the Company engage in any activities that Compete (as defined below) with the Company or an affiliate.  "Compete" means (x) developing, producing, selling, offering for sale, providing, or promoting the sale of any product or service that is the same as or competes with any product, service, or material of the Company or an affiliate; or (y) becoming an owner, officer, partner, employee, director, agent, representative, or consultant of any entity or person or having, directly or indirectly, a proprietary interest in a business, firm, partnership, limited liability company or other entity that provides, sells, offers for sale or promotes the sale of any product or service that is the same as or competes with any product or service of the Company or an affiliate.  Notwithstanding the foregoing, an otherwise voluntary separation from service that is deemed by the Company, in its sole discretion, to be a constructive termination of the Participant's employment by the Company will not be considered a voluntary separation from service for purposes of this subsection.  Notwithstanding the foregoing, this Section 5.6(e) will not apply to a Participant that has executed a waiver pursuant to Section 6.4.

(f) Nothing in the Plan shall be construed to limit a Participant's right, if any, under Section 7 of the National Labor Relations Act of 1935, 29 U.S.C. §§ 151-169, and/or other applicable laws to discuss the terms and conditions of Participant's employment or to engage in protected concerted activity as defined by law.  In addition, as detailed more fully in TIAA's Confidentiality Policy (a copy of which is available upon request), nothing in the Plan shall be construed to prohibit a Participant from first or later reporting, or assisting in the reporting or investigation, of possible violations of federal or state law or regulation to any governmental agency or self-regulatory organization, or making other disclosures that reasonably may be protected under whistleblower or other provisions of any applicable federal or state law or regulation.  Authorization by, or notice to, the Company is not required for any such reports or disclosures.

(g) Limitation. Notwithstanding the foregoing, to the extent that California or Massachusetts law applies to a Participant, Sections 5.6(b) and (e) shall not apply.  In such event, during Participant's employment with the Company until the expiration of twelve months following Participant's termination of employment for any reason, Participant shall not, in person or through the direction or control of others (i) solicit, interfere with, or endeavor to cause any employee of the Company to terminate his or her relationship with the Company (except as may be required in the ordinary course of Employee's employment with Company for Company's benefit) or (ii) induce or attempt to induce any employee to violate any legal obligations (contractual or otherwise) that he has to the Company. Participant shall be restricted from any unauthorized use of the Company's confidential and proprietary information and trade secrets for the purpose of having any Company client terminate, cancel, withdraw, reduce, diminish or limit, in any manner, the client's

relationship with the Company or to solicit any party in a business relationship with the Company to terminate, cancel, withdraw, reduce, diminish, or limit, in any manner, such relationship.

(h) Upon the Plan Administrator's reasonable, substantiated belief that a Participant has violated the confidentiality, non-solicitation, non-disparagement or non-competition requirements of Section 5.6, that Participant shall immediately forfeit any right to any outstanding Awards and any right to receive a payment of any Award (whether or not such Award is based on such Performance Units).

5.7    Notwithstanding the foregoing, any Participants identified in Appendix A shall be subject to the terms and conditions specified in such Appendix in addition to, or in lieu of, the terms and conditions otherwise set forth herein.

5.8    Award Reallocation

(a) In the event that a PM Team Member ceases to be a member of one or more (but not all) teams that manage Participating Funds during a Performance Cycle, the value of the Fund Interest(s) corresponding to such Participating Fund(s) will be reallocated to the PM Team Members' other Fund Interests as described below. An amount determined by the most recent Fund Interest Value of such prior Fund Interest will be reallocated to Fund Interests associated with all remaining (or new) Participating Funds managed by the PM Team Member's team(s), in such manner as determined by the Plan Administrator (or his designee), in writing, as soon as practicable following notice to the Plan Administrator under Section 3.2. The reallocated Fund Interests will continue to vest during the same applicable Performance Cycle of the prior Fund Interest(s). The prior Fund Interest(s) will then be canceled.

(b) In the event that a PM Team Member is no longer a member of any team that manages a Participating Fund during a Performance Cycle (but is still an Employee), the value of all Fund Interests shall be converted to LTPP Awards with a Recorded Value equal to the aggregate value of the canceled Fund Interests, determined based on the most recent Fund Interest Value of each canceled Fund Interest. The LTPP Awards will continue to vest during the same applicable Performance Cycle of the canceled Fund Interest(s). The reallocation will be made as soon as practicable following notice to the Plan Administrator under Section 3.2. After being reallocated, the Fund Interest(s) will be canceled.

(c) Notwithstanding the foregoing, the Plan Administrator may at any time reallocate the value of any PM Team Members' Fund Interest(s) to such PM Team Members' other Fund Interest(s) as described below. An amount determined by the most recent Fund Interest Value of such Fund Interest being reduced (or eliminated) will be reallocated to Fund Interest(s) associated with all remaining (or new) Participating Funds managed by the PM Team Member's team(s), in such manner as determined by the Plan Administrator.    Fund Interests will continue to vest during the same applicable

Performance Cycle of the reduced (or eliminated) Fund Interest(s).   The reduced (or eliminated) Fund Interest(s) will then be canceled.

## ARTICLE 6
### Termination of Employment/Leave of Absence

6.1     No Award Before Vesting:  Except in the circumstances set out below in Sections 6.2, 6.3, 6.4 or 6.5, a Participant whose employment with the Company and any other majority-owned subsidiary of TIAA terminates before vesting in Awards will have no right to an award based upon such Awards and will forfeit any right to any outstanding Awards and any right to receive a payment of any Award.

6.2     Death:  If a Participant's employment is terminated on account of death, or a Participant described in Sections 6.3, 6.4 or 6.5 dies before he has vested, any unvested Awards will become fully vested and such Awards shall become immediately payable to the Participant's Beneficiary to be paid at any time during the period beginning on the date of death and ending on December 31 of the first calendar year following the calendar year during which the death occurs, in the amount equal to the Recorded Value as of the December 31 immediately preceding the Participant's date of death. With respect to Fund Interests, such awards will be calculated based on the most recent value as of the Participant's date of death of the corresponding Participating Fund to which such Fund Interest relates.

6.3     Disability and Other Leaves of Absence:  If a Participant terminates employment due to Disability or if the Participant is on a Leave of Absence (and the Committee determines to have this Section 6.3 apply to such Leave of Absence), Awards will continue vest in accordance with the schedule in Section 5.2, even if the Participant is no longer an Employee on the vesting date as the result of the Disability or Leave of Absence, and an Award will be paid in accordance with Section 5.4 (unless otherwise provided in the grant of the Award).

6.4     Retirement:  If a Participant has a Retirement (as defined in Section 2.18), his Awards will continue to vest in accordance with the schedule in Section 5.2, even though the Participant is no longer an Employee on the vesting date, and an award will be paid in accordance with Section 5.4 (unless otherwise provided in the grant of the Award). Notwithstanding the foregoing, a Participant may, at any time prior to the payment thereof, waive his or her rights to continued vesting upon Retirement pursuant to this Section 6.4, provided that such waiver applies to all his or her outstanding Awards.

6.5     Job Elimination, Job Relocation or Change in Job Responsibilities. If a Participant's employment is (a) terminated due to a job elimination, job relocation or change in job responsibilities in connection with a business or support area restructuring, as evidenced by his having met the eligibility requirements for severance benefits under (with respect to Employees of TIAA) the TIAA Severance Plan or successor severance plan or, with respect to Employees of Companies other than TIAA, other Company severance plan or policy, including that the Participant has timely executed a release agreement as provided for in such plan, (b) terminated voluntarily in connection with a program offered under the TIAA Voluntary Separation Program or other voluntary separation program approved

14

by the Plan Administrator and applicable to a group of Employees , or (c) is otherwise terminated for such other reasons as may be approved by the Plan Administrator, his Awards will continue to vest in accordance with the schedule in Section 5.2, even though the Participant is no longer an Employee on the vesting date, and the awards based on those Awards will be paid in accordance with Section 5.4 (unless otherwise provided in the terms of the grant of the Awards).

6.6     Notwithstanding anything herein to the contrary, the Plan Administrator, at his discretion, may require a Participant to acknowledge in writing, in such form as is acceptable to the Plan Administrator, that the Participant is subject to and has not violated any of the provisions of Section 5.6 as a necessary condition to (a) the vesting of an Award by reason of the application of this Article 6 and/or (b) the payment of any Award under this Plan to the Participant.

**ARTICLE 7**
**General Provisions**

7.1   Plan is Unfunded:  The Plan is unfunded.  Awards will be paid as out of the general assets of the Company.

7.2   No Right to Employment:  The Plan does not constitute a contract of employment.  The fact that an Employee has been designated as a Participant in the Plan does not confer on the Employee any right to be retained in the employ of the Company or affect the right of the Company to terminate the employment of any individual for any reason as may otherwise be permitted by law.

7.3   No Right to a Grant or Award:  No Employee or former Employee shall have any claim or right to receive a grant under the Plan unless and until such grant is made.

7.4   No Right to Continued Participation:  An Employee's participation in the Plan during any Performance Cycle does not confer upon him any right to be designated as a Participant in any subsequent Performance Cycle.

7.5   No Assignment:  Rights to and interest in awards may not be assigned, used as collateral, or otherwise transferred either directly or by operation of law and no such right or interest of any Participant under the Plan shall be subject to any obligation or liability of a Participant other than any obligation or liabilities owed by the Participant to the Company.

7.6   Costs and Expenses:  All costs and expenses involved in administering and paying out awards under the Plan shall be borne by the Company.

7.7   Beneficiary Designation:  Each Participant may file, on a form provided by the Company, a written Beneficiary designation.  Such designation shall be revocable, unless the Participant designates a Beneficiary as irrevocable.  Any designation shall not be effective unless and until received by the duly authorized representative of the Company prior to the Participant's death.  If a Participant dies and there is no effective Beneficiary designation or the Beneficiary dies before payment is made, the Participant's Beneficiary shall be the Participant's estate.

7.8   Withholding:  The Company may withhold any taxes that it is required to withhold from any applicable award.  Each Participant, however, shall be responsible for the payment of all individual tax liabilities relating to any such award.

7.9   Applicable Law:  The Plan and all action taken pursuant to the Plan shall be governed by and construed in accordance with the laws of the State of New York.

7.10  Severability:  The invalidity or unenforceability of any one or more provisions of the Plan shall not affect the validity or enforceability of any other provision of the Plan, which shall remain in full force and effect.

7.11   Actions and Decisions Regarding the Business or Operation of the Company: Notwithstanding anything herein to the contrary, the TIAA Board of Trustees, the Committee, the Plan Administrator, the Company and its affiliates, and their trustees, officers, employees and agents shall not have any liability to any Participant or his Beneficiary under the Plan or otherwise on account of any action taken, or not taken, by any of the foregoing persons with respect to the business or operations of the Company or any entity controlling, controlled by, or under common control with the Company, notwithstanding the fact that any such action or inaction in any way whatsoever may adversely affect any awards, rights or benefits of a Participant or his Beneficiary under the Plan.

7.12   Other Plans:  Amounts paid under the Plan shall not be considered in determining the benefits to be paid from or contributions to be made to any other employee benefit plan provided by the Company, except where explicitly required by law.

7.13   Section 409A:  The Performance Awards granted under this Plan are intended to either not be subject to Section 409A of the Code or, if subject to Section 409A of the Code, to be administered, operated, and construed in compliance with Section 409A of the Code and all regulations and other guidance issued thereunder.

**FIRST AMENDMENT**
**TO THE**
**TIAA LONG TERM PERFORMANCE PLAN**
**(AS AMENDED AND RESTATED EFFECTIVE JANUARY 1, 2019)**

WHEREAS, Teachers Insurance and Annuity Association of America ("TIAA") established the TIAA Long Term Performance Plan (the "Plan"), as of January 1, 2005, which was most recently amended and restated effective as of January 1, 2019;

WHEREAS, pursuant to Section 3.1 of the Plan, the TIAA Compensation & Benefits Committee (the "Committee") has been delegated the authority to amend the Plan;

WHEREAS, the Committee wishes to amend the Plan to allow for awards of Fund Interests under the Portfolio Management Plan portion of the Plan that are made to participants located outside the United States to be denominated in local currency in order to neutralize currency fluctuations and exchange rate risk; and

WHEREAS, at a meeting on September 13, 2019, the Committee adopted the follow amendment;

NOW, THEREFORE, BE IT RESOLVED, that the Plan is amended as follows:

1. Section 2.17 shall be amended and restated to read as follows:

   Performance Factor: (a) With respect to the LTPP Awards, Performance Factor shall mean a percentage determined by the Committee, in its sole discretion, based on the annual performance of the TIAA enterprise, taking into account such applicable performance results from the Plan scorecard as determined by the Committee annually. A Performance Factor will be determined for each Plan Year.

   (b) With respect to Fund Interests granted on or after January 1, 2020, Performance Factor shall mean a percentage determined by the Committee (or its assignee), in its sole discretion, based on the annual performance of the Participating Fund to which the Fund Interest relates as determined by the Committee (or its assignee) annually in its sole discretion. A Performance Factor for each Participating Fund will be determined for each Plan Year.

2. Section 2.24 shall be amended and restated to read as follows:

   Recorded Value: (a) The amount of an LTPP Award or with respect to Fund Interests granted on or after January 1, 2020, a Fund Interest. The initial Recorded Value of an LTPP Award or, with respect to Fund Interests granted on or after January 1, 2020, a Fund Interest, is the amount of the awarded amount on the grant date. On an annual basis, the Recorded Value for an LTPP Award will be adjusted for the Performance Factor for such year in accordance with Section 5.3(a) and the Recorded Value for a Fund Interest will be adjusted for the Performance Factor for such Participating Fund to which the Fund Interest relates in accordance with Section 5.3(b). A Recorded Value for each LTPP Award or such Fund Interest is maintained on the books and records of the Company in the same currency in which the Participant's regular salary payments are made by the Company.

   (b) Effective as of January 1, 2019, in the event a Participant's employment transfers to a different jurisdiction such that the Participant's regular pay will be paid in a different currency, then solely with respect to LTPP Awards that were not outstanding as of December 31, 2018 and Fund Interests that were not outstanding as of December 31, 2019, the Recorded Value of each such LTPP Award or Fund Interest, as applicable, held by such Participant will be converted to such new currency as of the date of the transfer, using such exchange rate methodology as the Company determines in its sole discretion.

3. Section 5.3(b) is amended by the adding the following sentence to the end thereof:

Solely with respect to Fund Interests granted on or after January 1, 2020, Fund Interest Value will be determined by multiplying the Recorded Value for such Fund Interest by the Performance Factor for such Participating Fund.

4. Section 5.4 shall be amended by adding the following sentence to end of the second paragraph therein:

For Fund Interests granted on or after January 1, 2020, payment will equal the Recorded Value of the Fund Interest as of the payment date.

5. The amendments described above shall be effective as of January 1, 2020.

**SECOND AMENDMENT**
**TO THE**
**TIAA LONG TERM PERFORMANCE PLAN**
**(AS AMENDED AND RESTATED EFFECTIVE JANUARY 1, 2019)**

WHEREAS, Teachers Insurance and Annuity Association of America ("TIAA") established the TIAA Long Term Performance Plan (the "Plan"), as of January 1, 2005, which was most recently amended and restated effective as of January 1, 2019;

WHEREAS, pursuant to Section 3.1 of the Plan, the TIAA Compensation & Benefits Committee (the "Committee") has been delegated the authority to amend the Plan;

WHEREAS, the Committee wishes to amend the Plan to allow for awards to be made as contemplated under the TIAA 2020 Voluntary Separation Program; and

WHEREAS, at a meeting on June 24, 2020, the Committee adopted the follow amendment;

NOW, THEREFORE, BE IT RESOLVED, that the Plan is amended as follows:

1. The first sentence of Section 5.1 shall be restated as follows:

   At the beginning of or during each Performance Cycle, if an eligible Employee's performance warrants and provided the Employee is in Good Standing, the Employee will be eligible to receive a long-term performance award in an amount determined under the Progressive Rate Table or by the Plan Administrator that, if granted, will be recorded as a grant of Awards subject to the terms and conditions of this Plan.

2. Section 5.1 shall be further amended to add the following new paragraph at the end thereof:

   Notwithstanding the foregoing, for the 2021-2023 Performance Cycle, the Plan Administrator may also grant a LTPP Award to an Employee prior to the beginning of such Performance Cycle, in an amount determined by the Plan Administrator, pursuant to the TIAA 2020 Voluntary Separation Program or as otherwise determined by the Plan Administrator. Such LTPP Award will be denominated in the currency in which the Employee's regular salary payments are made by the Company. Such LTPP Award will be subject to immediate forfeiture (notwithstanding anything to the contrary in Sections 6.2-6.5) if the Employee fails to execute (or revokes) a release agreement provided by the Company by the deadlines specified therein. For the avoidance of doubt, the value of such LTPP Award will only be impacted by performance during the 2021-2023 Performance Cycle.

3. The amendments described above shall be effective as of July 1, 2020.

**THIRD AMENDMENT**
**TO THE**
**TIAA LONG TERM PERFORMANCE PLAN**
**(AS AMENDED AND RESTATED EFFECTIVE JANUARY 1, 2019)**

WHEREAS, Teachers Insurance and Annuity Association of America ("TIAA") established the TIAA Long Term Performance Plan (the "Plan"), as of January 1, 2005, which was most recently amended and restated effective as of January 1, 2019;

WHEREAS, pursuant to Section 3.1 of the Plan, the TIAA Compensation & Benefits Committee (the "Committee") has been delegated the authority to amend the Plan;

WHEREAS, the Committee wishes to amend the Plan to provide for the potential for a subset of LTPP Awards to be valued according to different performance metrics, solely in the event the HR Committee of the Board of TIAA so approves;

WHEREAS, the Committee wishes to add a clarifying amendment to the Plan to provide for the reallocation or conversion of Fund Interests when a Participating Fund is liquidated as it relates to former Employees; and

WHEREAS, at a meeting on January 29, 2021, the Committee adopted the follow amendments;

NOW, THEREFORE, BE IT RESOLVED, that the Plan is amended as follows:

1. New Sections 2.13 and 2.14 are added to read as follows (and the remainder of such sections to be appropriately renumbered):

   2.13 LTPP Award Scorecard:  With respect to any LTPP Award, one or more metrics (as determined by the Committee in writing within four months of the start of the Performance Cycle for such LTPP Award) that will be applicable to a Plan Year within the Performance Cycle or the entire Performance Cycle and is intended to measure the annual or 3-year performance, respectively, of the TIAA enterprise or any portion thereof.  For the avoidance of doubt, the Committee may select a different metric or set of metrics for different LTPP Awards such that LTPP Awards for a particular Performance Cycle may have different LTPP Award Scorecards. Notwithstanding the foregoing, the Enterprise Scorecard will be the LTPP Award Scorecard applicable to all LTPP Awards unless the Committee has specifically designated a different LTPP Award Scorecard as applicable to specified LTPP Awards.

   2.14 Enterprise Scorecard:  The LTPP Award Scorecard measuring TIAA enterprise performance that is determined annually by the Committee and applies to all outstanding LTPP Awards except for those for which the Committee has specifically designated as subject to a different LTPP Award Scorecard.

2. Section 2.19(a) (as renumbered) shall be amended and restated in entirety to read as follows:

   With respect to the LTPP Awards, Performance Factor shall mean a percentage determined by the Committee, in its sole discretion, based on the performance of the TIAA enterprise or a portion thereof, taking into account such performance results from the applicable LTPP Award Scorecard for such LTPP Awards, as determined by the Committee. A Performance Factor will be determined for each Plan Year, except in the case of any LTPP Awards for which the Committee has specified only a three-year LTPP Award Scorecard.

3. In Section 2.20 (as renumbered), the words "Plan scorecard" shall be replaced with the words "Enterprise Scorecard."

4. In Section 2.26(a) (as renumbered), the third sentence shall be amended and restated to read as follows.

When a new Performance Factor is determined (which is typically done on annual basis), the Recorded Value for an LTPP Award will be adjusted for such applicable Performance Factor in accordance with Section 5.3(a) and the Recorded Value for a Fund Interest will be adjusted for the Performance Factor for such Participating Fund to which the Fund Interest relates in accordance with Section 5.3(b).

5. A new sentence is added to the end of Section 5.3(a) to read as follows:

Notwithstanding the foregoing, for any LTPP Awards for which a Performance Factor is not established annually (e.g., LTPP Awards with a three-year LTPP Award Scorecard), such LTPP Awards shall not have a change in a value until the Performance Factor has been determined for such LTPP Award – in which case the LTPP Awards shall be determined as of the last day of the measurement period by multiplying the Recorded Value for such LTPP Award by the applicable Performance Factor for such LTPP Award.

6. Effective as of December 1, 2020, a new Section 5.8(d) shall be amended to read as follows:

In the event that a Participating Fund is liquidated, the value of the Fund Interest(s) corresponding to such Participating Fund will be reallocated to the PM Team Members' other Fund Interests, if applicable, or converted to LTPP Awards, in such manner as determined by the Plan Administrator (or his designee), in writing, as soon as practicable following notice to the Plan Administrator under Section 3.2. The reallocated Fund Interests or LTPP Awards will continue to vest during the same applicable Performance Cycle of the prior Fund Interest(s). The prior Fund Interest(s) will then be canceled.

7. Except as otherwise provided, the amendments described above shall be effective as of January 1, 2021.

**FOURTH AMENDMENT**
**TO THE**
**TIAA LONG TERM PERFORMANCE PLAN**
**(AS AMENDED AND RESTATED EFFECTIVE JANUARY 1, 2019)**

WHEREAS, Teachers Insurance and Annuity Association of America ("TIAA") established the TIAA Long Term Performance Plan (the "Plan"), as of January 1, 2005, which was most recently amended and restated effective as of January 1, 2019;

WHEREAS, pursuant to Section 3.1 of the Plan, the TIAA Compensation & Benefits Committee (the "Committee") has been delegated the authority to amend the Plan;

WHEREAS, the Committee wishes to amend the Plan to comply with remuneration regulations by permitting the application of (1) a 6-month retention requirement following vesting and (2) malus and clawback provisions, in each case, as applicable, for impacted code staff; and

WHEREAS, at a meeting on December 9, 2021, the Committee adopted the follow amendments;

NOW, THEREFORE, BE IT RESOLVED, that the Plan is amended as follows:

1.  A new sentence shall be added to the end of Section 5.4:

    Notwithstanding the foregoing, Awards granted after January 1, 2022 to Participants that are designated by the Plan Administrator as "code staff" may be subject to a six-month delay in accordance with applicable law.

2.  A new Section 5.7 shall be added to the Plan to read as follows:

    Notwithstanding anything to the contrary, effective for Awards granted after January 1, 2022, Awards for those Participants that are designated by the Plan Administrator as code staff may be subject to the malus and clawback policy of the Company as may be in effect from time to time, and which may provide for the forfeiture of Awards, regardless of whether such Awards are deemed vested under the Plan.

3.  Except as otherwise provided, the amendments described above shall be effective as of January 1, 2022.

EXHIBIT 3

# ⊡TIAA   ⊡TIAA Bank   **nuveen**

Date:_____

## CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

This CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT (this "**Agreement**") is made and entered into as of the date set forth on the signature page below by and between the undersigned individual ("**Employee**") and Teachers Insurance and Annuity Association of America ("**TIAA**") and/or any companion company or subsidiary of TIAA that employs Employee now existing or formed in the future (including but not limited to Nuveen Services, LLC ("**Nuveen**") and TIAA, FSB (the "**Bank**"), together with each of their subsidiaries, funds, and companion companies, collectively with TIAA, "**Company**" or "**the Company**"). Employee and the Company are referred to collectively as "the parties" in this Agreement. This Agreement is effective as of the date that Employee manually or electronically signs this Agreement as set forth on the signature page below (the "**Effective Date**").

In consideration of Employee's job offer, employment and related benefits (such as but not limited to any designated payments, compensation, salary increases, promotions, training or professional development opportunities) and/or such other consideration as is offered by the Company in its sole discretion in connection with this Agreement, the receipt and sufficiency of which is acknowledged by Employee, and in mutual reliance upon the promises set forth herein, the parties agree as follows:

### PURPOSE OF THIS AGREEMENT

The purpose of this Agreement is to protect the Company's legitimate business interests and assets. In reliance upon Employee's promises in this Agreement, the Company will provide Employee with Confidential Information (defined below) and place Employee in a position of enhanced ability to use and influence the goodwill of the Company with its clients, employees and other business relationships. An important basis for this Agreement is to prevent Employee from using the unfair competitive advantage arising from Employee's position of trust with the Company to cause irreparable damage to the Company's trade secrets and important business relationships. Employee stipulates that the restrictions and covenants in this Agreement are reasonable in time, territory, impact and scope, for this purpose and do not place an unreasonable or unnecessary burden on Employee.

1. <u>UNAUTHORIZED DISCLOSURE OR USE OF THE COMPANY'S CONFIDENTIAL INFORMATION IS PROHIBITED.</u>

(a) **CONFIDENTIAL INFORMATION.** "**Confidential Information**" as used in this Agreement refers to an item of information, or a compilation of information, in any form (tangible or intangible), related to the business of the Company that the Company has not made public or authorized public disclosure of, and that is not generally known, through proper means, to the public or others who would be able to use or get value from the information. Confidential Information will not lose its protected status under this Agreement if it becomes known to other persons through improper means such as the unauthorized use or disclosure of the information by Employee or another person. Confidential Information includes the Company's trade secrets, but an item of Confidential Information need not qualify as a trade secret to be protected by this Agreement unless required by law. Company's exchange of Confidential Information with a third party in confidence for business purposes will not remove it from protection under this Agreement. Confidential Information further includes, but is not limited to, the following types of information as maintained within the Company's internal, non-public records:

(i)     the identities of Clients (defined below), including, but not limited to, names, addresses, telephone numbers, email addresses and/or social security numbers; any account, personal, business, financial and other confidential information pertaining to Clients; any Client lists, spreadsheets, data files or any portion thereof; any

information related to the assets and obligations carried in an account by a Client; any Client's positions, profiles, accounts, account valuation, account performance history and/or personal circumstances; and the Company's approach to and strategies for, geographically, territorially or otherwise, targeting, developing, maintaining, servicing and managing Client relationships;

(ii)   information about the Company's previous, current, and/or contemplated products and services, activities, regions, territories, know-how, investment techniques and strategies, computer passwords, computer software designs and hardware configurations, training materials, policies and procedures, sales and marketing methods, competitive analyses, presentations and research projects;

(iii)   track records; market, financial, trade, and sales information and data; pricing; financial models or formulas; balance sheets; financial plans; strategic plans; business plans; growth plans; financial and business forecasts, budgets, and estimates; and any other information about profits, losses, surpluses, costs or expenses of the Company;

(iv)   management-level employee analysis and file materials such as records regarding job performance, talent management/acquisition strategy, compensation strategy, benefits strategy or disciplinary files maintained by management personnel; business, financial and other operational information pertaining to Company vendors, suppliers, contingent workers and independent contractors; employee Social Security Numbers, personal medical information, account information, or other highly sensitive and proprietary information; and vendor, supplier, contingent worker and/or independent contractor lists;

(v)   the specific terms of the Company's agreements or arrangements, verbal or written, with any Client, vendor, supplier, licensor, licensee or contractor with whom the Company may be associated, including, but not limited to, anything of value provided or received by the Company or the termination date or circumstances of any agreement or arrangement; and

(vi)   any and all technical, proprietary or other information that the Company has a legal or ethical obligation to treat as confidential, or that the Company treats as proprietary, confidential, or for internal use only; that the Company has designated as confidential or proprietary; that the Company has compiled, prepared and produced specifically for any federal, state or local regulator; or, that Employee knows should be, or has been, treated by the Company as confidential, in each case, whether or not such information is or was owned or developed by the Company and which shall include, but not be limited to, information relating to third parties that is provided to the Company during merger, acquisition, or divestiture activities, or documents, communications or other material that are or may be protected by the attorney-client privilege, the attorney work-product doctrine or privilege or any other applicable legal privilege.

The foregoing items of information are proprietary assets of the Company and are by agreement presumed to be trade secrets of the Company. This presumption of trade secret status will control unless clear and convincing evidence is presented by Employee to prove that the particular item at issue does not qualify as a trade secret.

(b) **LIMITED USE, NONDISCLOSURE AND REPORTING OBLIGATIONS.** Employee will not engage in any unauthorized use or disclosure of Confidential Information. This restriction applies during employment and for so long thereafter as the information qualifies as Confidential Information. Unless authorized in writing by Company, the only authorized use or disclosure of Confidential Information shall be use or disclosure required in the ordinary course of Employee's employment (with disclosure limited to only those who have a need-to-know), consistent with Employee's assigned duties (including any required regulatory reporting as applicable) and undertaken for the benefit of the Company. The foregoing shall not, however, be construed to prohibit an employee of Company (i) who is not in a management or supervisory role from using or sharing lawfully acquired information about terms and conditions of employment with Company (such as wages, benefits or working conditions) with others engaged in concerted activity protected by law (such as employees acting together to improve employment conditions or address job-related problems), or (ii) from providing testimony in response to or otherwise responding to any lawfully-issued subpoena, court order, or other

compulsory legal process; provided, however, that if such testimony or response may require the disclosure of Confidential Information, prior to disclosing the Confidential Information, where allowed by law and except as provided in the **NOTICE** paragraph immediately below, Employee shall provide Company as much notice (in writing to TIAA's Chief Legal Officer) as is possible under the circumstances (presumably not less than seven business days), cooperate in any legal efforts of the Company to maintain the confidentiality of the information at issue (such as securing written assurances that confidentiality will be maintained) and disclose only that portion of the information that is legally required. Any request for documents or information addressed to the Company itself, or seeking the Company's position or response on any matter, must be referred to the responsible individual within the Company (if not Employee) for an official response on behalf of the Company.

    **(A) NOTICE:** Notwithstanding the foregoing, and subject further to the TIAA Confidentiality Policy, nothing in this Agreement shall be construed to prohibit Employee from first (or later) reporting, or assisting in the reporting or investigation, of possible violations of any law or regulation to any federal, state or local governmental agency or self-regulatory organization, or making other disclosures that reasonably may be protected under whistleblower or other provisions of any applicable federal, state or local law or regulation. Authorization by, or notice to, the Company is not required to make any such reports or disclosures. The Company, however, wants all employees to promptly report any knowledge or concerns about any acts associated with or related to the Company that may constitute fraud, theft or other wrongdoing or may violate any law or regulation, anonymously if desired, through the Company's Ethics Help Line at (877) 774-6492. The Company confirms that, consistent with the TIAA Code of Business Conduct, retaliation against any employee for sharing such knowledge or concerns will not be tolerated.

**(c) EMPLOYEE'S OBLIGATIONS REGARDING CERTAIN INFORMATION.**

    (i)    Employee shall not use or disclose to the Company during Employee's employment any confidential or proprietary information belonging to any other third party, including any former employers or former colleagues of Employee, without authorization to do so from the third party.

    (ii)    Federal law prohibits trading, tipping and/or aiding or abetting those trading on the basis of "Material Non-Public Information" (MNPI). As used in this paragraph, information is deemed "Material" if: there is a substantial likelihood a reasonable investor would consider the information important in making an investment decision; disclosure of the information would be viewed by reasonable investors as having significantly altered the total mix of information made available; disclosure is reasonably certain to have a substantial effect on the market price of the security; or disclosure is reasonably certain to have a substantial effect on the values (Net Asset Value / Asset Unit Value) of the Company's proprietary funds and accounts. Information is deemed "Non-Public" if it has not been disseminated such that it is generally available to investors or the securities markets. Employee will fully cooperate with the Company's efforts to ensure lawful handling of MNPI obtained by Employee in the course of Employee's employment. To that end, Employee will comply with notification, brokerage account disclosure and other compliance requirements as specified in the applicable Company policies or as requested by the Company to ensure lawful handling of MNPI.

**2.**    **NOTICE AND NON-INTERFERENCE OBLIGATIONS.** Employee stipulates that the confidentiality and non-disclosure obligations of this Agreement standing alone (as set forth in Section 1 and its subparts above) are insufficient to provide Company with adequate protection of its trade secrets, goodwill and other protectable interests, and that it is reasonable and necessary for the protection of the Company's legitimate interests for the parties to further agree as follows:

**(a) DEFINITIONS.** As used in this Agreement:

    (i)    **"Business Relationship"** refers to the relationship between the Company and its vendors, suppliers, independent contractors, contingent workers, licensees and licensors;

(ii)   "**Client**" means any individual or entity (including, without limitation, any investors and participants) that is doing business, or may prospectively be doing business, with the Company, including without limitation an individual or entity that is the subject (in whole or part) of a written or verbal agreement, strategy or proposal by the Company or of demonstrable preparations by the Company to pursue an agreement, strategy or proposal;

(iii)   "**Material Contact**" means (A) engaging in communications with the Client about the Client's actual or prospective business relationship with the Company; (B) supervising or coordinating the Client's business dealings with the Company; or (C) obtaining or learning Confidential Information from or about the Client as a result of Employee's association with the Company;

(iv)   "**Referral Firm**" means a third party that enters into a written services agreement (*e.g.*, TIAA Advisor Master Agreement or Registered Advisor Master Agreement) with the Company;

(v)   "**Solicit**" means to engage in any communication that knowingly assists, induces or encourages the other party to take a desired action regardless of which party first initiated contact or whether the communication was in response to a question or inquiry;

(vi)   "**Termination Date**" is the date Employee's employment relationship with Company ends regardless of which party ends the relationship or why; and

(vii)   "**Damages**" refers to monetary compensation or other relief that Company may claim or assert entitlement to arising from breach of this Agreement by Employee.

(b)   NOTICE OF TERMINATION OF EMPLOYMENT BY DESIGNATED EMPLOYEES.  Employee must provide thirty (30) days of written notice (or electronic notice through the Company's designated Human Resources system for communicating resignation from employment) of Employee's intention to resign and to end Employee's employment (the "**Notice Period**") if Employee elects to resign from and terminate Employee's employment and Employee is <u>not</u> employed in a position in Tiers 6 IC-1 IC (or their equivalent as determined by TIAA) in TIAA's National Contact Center and Retail Client Services area, and is <u>not</u> employed in a position in Tiers 11 PL-1 IC (or their equivalent as determined by TIAA) by (i) the Bank; (ii) TIAA Commercial Finance, Inc.; or (iii) Elite Lender Services, Inc..  [The Notice Period shall not apply to Employee if Employee transfers and holds a position at TIAA as of the Termination Date that is in Tiers 11 PL-1 IC (or their equivalent as determined by TIAA) and is designated by the Company as not Client-facing.]  During any Notice Period, Employee will follow the Company's instructions regarding transition of duties and ongoing work responsibilities to whomever the Company directs.  This includes an obligation by Employee to use Employee's best efforts to help the Company retain its Clients and Business Relationships that Employee has some Material Contact or involvement with. During the Notice Period, Employee shall not become employed by or engaged to provide any services to any third party without the prior written consent of the Company.  During the Notice Period, the Company shall maintain its right to relieve Employee of Employee's job duties, to terminate Employee's access to Company networks and communications systems and to require Employee to provide the Company such services, or no services, as the Company may specify.  During the Notice Period, and except in circumstances as provided below, Employee shall continue to be eligible to receive base compensation and to participate in all Company benefit plans and policies for which Employee is eligible in accordance with the terms of such benefits plans or policies in effect from time to time.  The Company, while not having any obligation to provide Employee with any period of notice of termination of employment, reserves the right, however, to accept Employee's resignation and terminate Employee's employment before the expiration of the Notice Period with no obligation for continued base compensation or employee benefits (as described in the preceding sentence) beyond Employee's Termination Date by mutual agreement of the parties hereto or if Company concludes Employee breached a term of this Agreement, violated a Company policy (including but not limited to the TIAA Code of Business Conduct) or unreasonably engaged in conduct that is inconsistent with the Company's business needs or values.

**(c) RESTRICTION PROHIBITING INTERFERENCE WITH EMPLOYEES.** During Employee's employment and for a period of six (6) months following Employee's Termination Date, Employee shall not, in person or through the direction or control of others (i) solicit, interfere with, or endeavor to cause any employee of the Company to terminate the employee's relationship with the Company (except as may be required in the ordinary course of Employee's employment with Company for Company's benefit) or (ii) induce or attempt to induce any employee to violate any legal obligations (contractual or otherwise) that the employee has to the Company.

**(d) RESTRICTION PROHIBITING INTEREFERENCE WITH CLIENT RELATIONSHIPS.** During Employee's employment (including any Notice Period) and for a period of twelve (12) months following Employee's Termination Date, Employee shall not directly or indirectly, on Employee's own behalf or on behalf of any third party (including any Referral Firm), solicit, divert, take away, or attempt to solicit, divert, or take away any Client, with whom Employee had Material Contact in the eighteen (18) months prior to Employee's separation from employment, for the purpose of having such Client terminate, cancel, withdraw, reduce, diminish or limit, in any manner, the Client's relationship with the Company. [The post-employment restrictions in this provision will not apply if, for the twelve (12) months immediately preceding the Termination Date, Employee held a position with the Company that is designated by the Company as not Client-facing.] Employee agrees that relationships between the Company and its Clients involve substantial goodwill and repeat business that is a valuable Company asset, and it is therefore reasonable to provide that such may not be misappropriated in violation of this Agreement for Employee's own use or benefit or for the use or benefit of any third party, including any Referral Firm.

(i)     If California law applies to this Agreement, however, the preceding paragraph shall not apply, and Employee shall be restricted from any unauthorized use of the Company's trade secrets (as further provided in the TIAA Confidentiality Policy, the TIAA Code of Business Conduct and other applicable policies) for the purpose of having any Client terminate, cancel, withdraw, reduce, diminish or limit, in any manner, the Client's relationship with the Company.

**(e) RESTRICTION PROHIBITING INTERFERENCE WITH OTHER BUSINESS RELATIONSHIPS.** During Employee's employment and for a period of six (6) months following Employee's Termination Date, Employee shall not, in person or through the direction or control of others, solicit any party in a Business Relationship with the Company that Employee had material dealings with or Confidential Information about during the last eighteen (18) months of Employee's employment with Company to terminate, cancel, withdraw, reduce, diminish, or limit, in any manner, its Business Relationship with the Company, except as may be required in the ordinary course of employment with Company and for Company's benefit.

(i)     If California law applies to this Agreement, however, the preceding paragraph shall not apply, and Employee shall be restricted from any unauthorized use of the Company's trade secrets (as further provided in the TIAA Confidentiality Policy, the TIAA Code of Business Conduct and other applicable policies) to solicit any party in a Business Relationship with the Company to terminate, cancel, withdraw, reduce, diminish, or limit, in any manner, such relationship.

(ii)     If Employee is employed in the Vendor Equipment Financing team of the Bank, however, the restrictions in Section 2(e) shall not apply to any vendors, suppliers, dealers, or distributors of equipment, software and/or related services who refer financing opportunities to the Company, provided that Employee shall be restricted from any unauthorized use of the Company's trade secrets (as further provided in the TIAA Confidentiality Policy, the TIAA Code of Business Conduct and other applicable policies) to solicit any party in a Business Relationship with the Company to terminate, cancel, withdraw, reduce, diminish, or limit, in any manner, such relationship.

**(f) GEOGRAPHIC LIMITATIONS.** Sections 2(c) – (e) shall be deemed to have a reasonable geographic limitation because they are limited by their nature to only those specific region(s) where the person or entity that the restriction limits solicitation of or interference with is located and available for solicitation or interference. Nevertheless, if Employee resides in a state that would require additional geographic limitation for a restriction in either Section 2(c), (d), or (e) to be enforceable, then the subject restrictions shall be considered limited to the region within the United

States assigned to Employee by Company within the last year of Employee's employment. If on the Termination Date the region or geography covered is not clear to Employee, Employee will submit a written request for clarification to Employee's immediate manager as of the Termination Date, and failure to do so will waive Employee's right to claim ambiguity or a lack of understanding at a later time.

**(g)  SPECIAL REMEDIES.**  Employee agrees that any violation of Section 2 of this Agreement will cause the Company to suffer damages that may be difficult to quantify at the time of the violation.  Therefore, the parties agree that the special remedies below will address situations where a breach occurs prior to or in spite of injunctive relief or other remedies compelling specific performance, and that these formulas and values represent reasonable estimates of damage the Company will incur for such violations:

(i)  If Employee breaches Section 2(c) of this Agreement and this causes (directly or indirectly) an employee to leave the Company, Employee will pay the Company a sum equal to 75% of base salary paid to the departing employee (at such employee's last applicable rate of base pay with the Company) to cover the direct and indirect costs of training a replacement for the employee.  This payment shall be in addition to, and not in lieu of recovery for any other actual or consequential damages suffered beyond direct and indirect training costs, or an order of specific performance, injunctive relief or other remedies designed to prevent further violations of this Agreement.

(ii)  If Employee breaches Section 2(d) of this Agreement and this causes (directly or indirectly) the Company to lose the business of the Client, Employee agrees to pay to the Company, in addition to all other remedies available (including injunctive relief), as liquidated damages, and not as a penalty, for each Client for whom Employee performs services following termination of employment with the Company the amount (as applicable) of: (A) the revenue received from each Client by Employee or any entity with which Employee associates during the twelve-month period following Employee's termination from employment with the Company or the revenue received from each Client by the Company during the twelve-month period preceding Employee's termination from employment with the Company, whichever amount is greater; and (B) the amount of any incentive compensation payment that Employee received in the year preceding the termination of employment with the Company, plus, for employees employed in Tiers 16 PL – 5 IC (or their equivalent as determined by TIAA) and whose position involves Client contact for business relationship purposes, the value (as computed by the Company) of the Company's investment in Employee's retention, including without limitation the Company's incurred costs in recruiting, training and developing Employee, which Employee acknowledges is a minimum of $25,000.

(iii)  If Employee breaches a post-employment restriction in this Section 2, then the post-employment time period for the violated restriction shall be extended by one day for each day Employee is in violation of the restriction but not to exceed a length of time equal to the period of post-employment restriction originally provided for, so that Company receives the length of compliance originally provided for in this Agreement.

## 3.  THE COMPANY'S OWNERSHIP OF WORK PRODUCT.

**(a)  WORK PRODUCT DEFINED.**  "Work Product" means any information or material, regardless of form, that Employee may directly or indirectly generate or produce (whether or not patentable, registrable, recordable or protectable by copyright and regardless of whether the Company pursues any such protection), including, but not limited to, software, source code, copyrights, trademarks, service marks, domain names, domain name registrations, documentation, memoranda, concepts, ideas, designs, inventions, processes, new developments or improvements, and algorithms, which do not infringe upon or violate and will not infringe upon or violate any other information, material, intellectual property or proprietary right of any third party.  Work Product also includes, but is not limited to, present and future discoveries, strategies, analyses, research and any other intellectual property, whether or not patentable, registrable, recordable or protectable by copyright.

**(b)  WORK PRODUCT IS COMPANY PROPERTY.**  All Work Product of Employee that (i) is developed within the scope of Employee's employment, with the assistance of Confidential Information, or utilizing the Company's equipment,

tools, facilities, personnel, or other resources or (ii) relates to the Company's business or actual or demonstrably anticipated research or development shall be considered Company property and "works made for hire"; and, as a result, all copyrights, mask rights, moral rights, and rights of control, development, distribution, and reproduction of every kind shall be deemed solely and exclusively owned by the Company.  Subject to any state-specific limitations required for a valid and binding invention assignment (refer to the **NOTICE** paragraph immediately below), Employee hereby assigns, transfers, and conveys to the Company Employee's entire right, title, and interest in and to all such Work Product, and in and to all patent, copyright, and trademark applications and patents, copyrights, and trademarks for such Work Product. Employee shall keep accurate records of all Work Product and, within ten (10) days of any written request by the Company, disclose fully in writing to the Company all Work Product that Employee has conceived or developed, in whole or in part, during Employee's employment.  Employee shall execute all documents or instruments the Company may request or deem necessary and take all other lawful actions at the Company's expense that the Company may request to vest, protect, memorialize, maintain, or exploit the Company's right, title, and interest in and to any Work Product.

      **(A)** **NOTICE**:  No provision in this Agreement is intended to require Employee to assign any of Employee's rights to an invention that cannot be lawfully assigned to the Company under controlling state law.  If California law applies, the inventions assignment provisions of this Agreement will not require the assignment of an invention contrary to California Labor Code § 2870, which provides:  *(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either: (1) relate at the time of conception or reduction to practice of the invention to the employer's business, or actual or demonstrably anticipated research or development of the employer; or (2) result from any work performed by the employee for the employer; and (b) to the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.*

    **(c)** **CERTAIN WORK PRODUCT NOT DEEMED COMPANY PROPERTY.**  Employee shall not be required to assign, transfer or convey to the Company any right, title or interest that Employee may have in or to any Work Product that Employee invents, discovers, makes, or conceives during Employee's employment if, and only if, (i) no Company property, including Confidential Information, is or was used in the Work Product's creation; (ii) Employee developed the Work Product entirely on Employee's own time; (iii) the Work Product does not relate to the Company's business or any Company research or development; and (iv) the Work Product is not in any way a result of any work Employee performed for the Company.  It is Employee's burden to demonstrate that Work Product is not deemed Company property.

    **(d)** **COMPANY'S LICENSE TO USE INTELLECTUAL PROPERTY.**  Employee hereby grants to the Company a perpetual, irrevocable, fully paid-up, royalty-free, worldwide license to the use and control of any item of intellectual property (be it invention, work, idea, discovery, development, or other), whether or not conceived or created during employment, that is incorporated into a product or service of the Company by Employee, alone or with others, and to which Employee retains ownership rights that are not otherwise assigned, transferred or conveyed to the Company through this Agreement.

**4.** **EMPLOYEE MUST RETURN ALL COMPANY PROPERTY.**  Employee shall not remove any Company property, regardless of form and including, but not limited to, Confidential Information, from the Company's premises, except as authorized and required for Employee to perform Employee's job duties.  Employee shall also diligently search for and promptly surrender to the Company, upon request during Employee's employment, and immediately upon Employee's Termination Date, any Company property existing in tangible, written or electronic form in or under Employee's possession or control, including, but not limited to, Confidential Information, records, Client information, employee information, vendor or supplier information, contractor information, financial data or material of any kind, sales material, technical data, credit cards, badges or entry cards, keys, key fobs, laptop computers, handheld or mobile

devices, software, disks, blackberry mobile device, cell phone, mobile phone, iPad and any other equipment belonging to the Company. Employee irrevocably permits the Company to inspect any equipment or materials provided by the Company to Employee upon request by Company or on Employee's Termination Date. Following the Termination Date, Employee shall certify compliance with this section upon request by the Company.

**5.   COMMUNICATING ABOUT THE COMPANY AFTER SEPARATION.** Nothing in this section shall preclude a former employee from engaging in activity protected by applicable federal, state or local laws (including the National Labor Relations Act), including, for example, talking about or criticizing Company policies concerning wages, hours and other working conditions at the Company or disclosing or discussing unlawful conduct, including, for example, harassment, discrimination, retaliation, or sexual misconduct, or any other conduct that Employee has reason to believe is unlawful; or from complaining about business practices or conduct through the Company's internal processes; or from initiating or participating in legal action, administrative proceedings, and communications with regulators involving the Company. Subject to the foregoing, and to the maximum extent permitted by law, a former employee shall not, after separation from employment with the Company, directly, indirectly or anonymously, make or cause to be made about the Company: (a) any statements or comments, through the Internet, industry outlets or channels, social media, television, radio, print media, or before or to any other audience (including to current or former Company Clients or employees), stating or implying that the Company's services or business practices are or were inconsistent with industry standards or otherwise improper; or (b) any statements or comments through the Internet, industry outlets or channels, social media, television, radio, print media, or before or to any other audience (including to current or former Company Clients or employees) that harass (as defined in the Company's Equal Employment Opportunity Policy), threaten, or make knowingly false statements against the Company's trustees, representatives, officers, directors, or employees.

**6.   EMPLOYEE MUST NOTIFY FUTURE EMPLOYERS OF THESE OBLIGATIONS.** Employee shall disclose Employee's obligations under this Agreement to any prospective or future employer or contractor before commencing employment with or providing services to any such employer or contractor. This obligation shall remain in force for three years following Employee's separation from employment with the Company or for Employee's next three places of employment (or contracting or consulting), whichever occurs sooner. Employee shall provide any such employer or contractor with a copy of this Agreement, whether or not requested by such employer or contractor. The Company retains discretion to notify any such employer or contractor at any time of the existence of this Agreement, Employee's obligations under same and any concerns as to possible noncompliance by Employee. Employee consents to such communication by the Company to any future employer or contractor of Employee's at any time and agrees not to assert any claim or cause of action against the Company based on such a communication. [This provision does not relieve Employee of any ongoing obligations set forth in this Agreement that require compliance beyond those specified in this section.]

**7.   A COURT OF LAW MAY COMPEL EMPLOYEE TO HONOR THESE OBLIGATIONS.** Employee's actual or threatened breach of this Agreement shall entitle the Company to temporary, emergency, preliminary, and permanent injunctive relief to compel Employee's specific performance of Employee's obligations under this Agreement, it being agreed that any breach or threatened breach of this Agreement by Employee would cause immediate and irreparable injury to the Company that could not be adequately compensated by money damages. Notwithstanding any requirement to arbitrate the ultimate merits of any claim for Employee's breach, including any requirement imposed by the Financial Industry Regulatory Authority's Code of Arbitration Procedure, the Company shall be entitled to obtain temporary, emergency, or preliminary injunctive relief in court. If arbitration applies, such court shall have equitable authority to engage in partial enforcement or reformation of the Agreement as needed for temporary enforcement to avoid irreparable harm pending a final award or other relief awarded in arbitration. The Company shall be entitled to expedited discovery without the need for a court order authorizing such discovery, including depositions, in connection with any proceeding alleging breach or threatened breach of this Agreement, regardless of whether expedited discovery would otherwise be available under applicable law. Nothing herein prohibits Company from seeking other equitable or legal remedies for a breach or threatened breach, including the recovery of money damages. Company will be entitled to reasonable attorneys' fees, expenses, and costs incurred with respect to any action to enforce this Agreement, including costs associated with computer forensics and the retention of experts. The Company shall be deemed the

prevailing party for purposes of recovering its attorneys' fees and costs described above if it recovers any element of injunctive relief or damages, even if the relief granted is less than what the Company sought or the Court needs to reform the Agreement to enforce it.

**8.   FORM OF PARTIES' SIGNATURES AUTHORIZED.**  The parties acknowledge that the form of signature provided below is binding upon them as follows:

   **(a)**  If electronic signature is requested by the Company, Employee affirms Employee's voluntary intent to enter into and authenticate this Agreement by electronic means.  Employee understands and agrees that Employee's electronic signature has the same binding effect as Employee's actual written signature.  Employee affirms that Employee is the sole signer of this Agreement by electronic means, and that no forgery, alteration or other concern exists as to the validity of Employee's execution of this Agreement in this manner.  Employee understands that this Agreement may be requested or made available in non-electronic form without cost.

   **(b)**  The Company name, designated officer, department and corporate logo/trademark printed in the Company Representative section below acts as the Company's signature, reflecting its intent to execute and authenticate this Agreement as of the Effective Date.

**9.   SURVIVAL.**  This Agreement will remain in effect despite any change in Employee's position, duties, salary, or other terms of employment with Company (including any successor TIAA-affiliated employing entity).  The post-employment obligations of Employee shall survive the end of Employee's employment regardless of whether Employee or Company terminates the employment relationship or why.  This Agreement shall not be construed to limit or replace any legal duties Employee would otherwise have to the Company absent this Agreement.  The existence of any claim or cause of action by Employee against the Company based on alleged duties or obligations arising outside of this Agreement, in whole or in part, shall not be a defense to the enforcement of this Agreement by Company.

   **(a)**  If a restriction on Employee as established in this Agreement is ruled overbroad and unenforceable as written or pursuant to any governing occupational rules of professional conduct (as applicable), then the ruling Court or arbitrator (if applicable) shall enforce the restriction in such narrower manner as is necessary for lawful enforcement in the jurisdiction and if needed reform the Agreement to the extent necessary for such enforcement.  If despite the foregoing a provision of this Agreement remains illegal or unenforceable as determined by a Court, then said provision shall be treated as if absent and never included in this Agreement and it shall not affect the validity or enforceability of any other provision of this Agreement.

   **(b)**  Employee may have previously entered into other agreements with the Company that impose restrictions and/or obligations on Employee concerning topics covered in this Agreement.  This Agreement supersedes and cancels all prior or contemporaneous written agreements specifically titled "Confidentiality and Non-Solicitation Agreement" or "TIAA Confidentiality and Non-Solicitation Agreement" that Employee may have entered into with the Company, but no others; provided, however, that if this Agreement is found to be void or unenforceable by a Court, then any prior agreement between the parties concerning the same subject matter that was replaced by this Agreement will no longer be considered superseded and will spring back into effect and application as if never superseded.  If any written agreement between Employee and the Company that is not specifically superseded by the preceding sentence imposes restrictions and/or obligations on Employee that conflict with terms in this Agreement, those restrictions and/or obligations that the Company deems more protective of its interests shall govern.

**10.   OTHER MISCELLANEOUS PROVISIONS.**  The terms of this Agreement and any disputes arising out of it shall be construed under and governed by the laws of the State of New York, notwithstanding any conflict of law principles of any jurisdiction to the contrary.  This Agreement shall inure to the benefit of Company, Company's parent, subsidiaries, affiliates, companion companies, successors and assigns, and will bind Employee, and Employee's heirs, executors, and administrators.  Employee consents to the assignment of this Agreement by the Company at its discretion.  Without the need for any such assignment, Employee's obligations to the Company under this Agreement shall extend to TIAA and

any affiliate, companion entity or subsidiary of TIAA, now existing or formed in the future, that employs Employee, that Employee provides services to, or from which Employee receives Confidential Information, any one or more of which may enforce this Agreement to protect its legitimate business interests and all of which shall be considered part of Company for such purpose.  Employee's obligations under this Agreement are personal in nature and shall not be assigned by Employee to another party.  This Agreement may not be modified or amended by the parties except in writing as authorized by the Company expressly stating an intent to do so; any modification or amendment of this Agreement to Employee's benefit (as determined by the Company) shall not require further electronic or written execution by Employee.  No waiver by Company of a breach by Employee shall be deemed to be a waiver of any subsequent or separate breach.  The section headings in this Agreement are inserted for convenience only and are not intended to affect the interpretation of this Agreement.  Subject to Employee's obligation under Section 2(b), nothing in this Agreement shall be construed to create a contract of employment for a specific term or to modify the at-will nature of the parties' employment relationship.

**11. EMPLOYEE'S AFFIRMATION OF THOROUGH REVIEW AND OPPORTUNITY TO CONSULT WITH AN ATTORNEY.**
EMPLOYEE AFFIRMS THAT EMPLOYEE HAS HAD AT LEAST 14 CALENDAR DAYS TO CAREFULLY READ THIS AGREEMENT, AND TO KNOW AND UNDERSTAND ITS TERMS, CONDITIONS AND EFFECTIVE DATE.  EMPLOYEE IS ADVISED, AND HAS HAD THE OPPORTUNITY, TO CONSULT WITH AN ATTORNEY OF EMPLOYEE'S CHOOSING IN CONNECTION WITH THIS AGREEMENT AND ASK ANY QUESTIONS THAT EMPLOYEE MAY HAVE PRIOR TO SIGNING THIS AGREEMENT.

* * *

ACCEPTED, ACKNOWLEDGED AND AGREED TO:

**Employee**
Employee Name (Please Print): _____

Employee Signature: _____

Date  : _____

**Company Representative**
Teachers Insurance and Annuity Association of America
Chief Human Resources Officer, Human Resources

**TIAA**